PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No: 03-2173

_____

UNITED STATES OF AMERICA

v.

PAUL G. SCZUBELEK


Paul Sczubelek,

Appellant


_____


Appeal from the United States District Court
for the District of Delaware
(D.C. No. 94-cr-00008-1)
District Judge: Chief Judge Sue L. Robinson

_____


Argued February 12, 2004

Before: SCIRICA, Chief Judge, ROTH & MCKEE Circuit
Judges

(Opinion filed: March 21, 2005)

Eleni Kousoulis **(Argued)**
Office of Federal Public Defender
704 King Street
First Federal Plaza, Suite 100
Wilmington, DE 19801

### Counsel for Appellant

Adam G. Safwat, Esquire **(Argued)**
Office of United States Attorney
1007 Orange Street, Suite 700
Wilmington, DE 19899

### Counsel for Appellee

---

O P I N I O N

---

ROTH, <u>Circuit Judge</u>

The DNA Analysis Backlog Elimination Act of 2000 (DNA Act), 42 U.S.C. §§ 14135 - 14135e (2001 Supp.), mandates the collection of DNA samples from prisoners, parolees, and individuals on probation and supervised release who have committed certain qualifying offenses. While Paul Sczubelek was on supervised release, he refused his probation officer's direction to give a DNA sample. The District Court

2

ordered him to do so.  Sczubelek appealed on the grounds that the collection of a DNA sample is an unconstitutional search in violation of the Fourth Amendment and also in violation of the separation of powers doctrine.  Prior to oral argument in this appeal, Sczubelek finished serving his term of supervised release.  For this reason, he now also asks that we dismiss his appeal as moot because the District Court no longer has jurisdiction over him to enforce its order.

We conclude first of all that this case is not moot.  The District Court's jurisdiction extended beyond the expiration of Sczubelek's term of supervised release because, while Sczubelek was still serving his term of supervised release, the court issued a summons based on a violation of a condition of his release and the delay between the expiration of his term and the adjudication of the violation is "reasonably necessary."  *See* 18 U.S.C. § 3583(i).  Turning to the merits of his appeal, we conclude that under Fourth Amendment reasonableness standard for analyzing the constitutionality of government searches and seizures, the collection of DNA samples from individuals on supervised release is constitutional.  The government's interest in building a DNA database for identification purposes, similar to its interest in maintaining fingerprint records, outweighs the minimal intrusion into a criminal offender's diminished expectation of privacy.  We conclude finally that there is no violation of the separation of powers doctrine in the assignment to the U.S. Probation Office of the taking of the DNA samples.

## I.  FACTS AND PROCEDURAL HISTORY

On June 17, 1994, a jury convicted Paul Sczubelek of

3

three counts of bank robbery under 18 U.S.C. § 2113(a) and one count of structuring cash transactions under 31 U.S.C. §§ 5322(a) and 5324(3).  On September 16, 1994, the District Court sentenced Sczubelek to 87 months of imprisonment and three years of supervised release.  The conditions of Sczubelek's term of supervised release did not expressly include submitting a DNA sample.  Sczubelek was released from prison in August 2000 and placed on home confinement until he began serving his term of supervised release on October 6, 2000.  Shortly thereafter, Congress enacted the DNA Act.  The submission of a DNA sample then became a mandatory condition of supervised release.  Approximately one year after Sczubelek commenced serving his term, a probation officer informed  Sczubelek that he must submit to DNA collection on September 25, 2002.  Sczubelek refused.

On October 1, 2002, the Probation Office filed a petition for violation of a mandatory condition of supervised release.  On October 15, the District Court ordered Sczubelek to appear for a hearing on the alleged violation.  After briefing and a hearing, the court found that the DNA Act's requirement that Sczubelek "submit to a DNA sampling does not violate his Fourth Amendment right against unreasonable searches and seizures." *United States v. Sczubelek*, 255 F.Supp. 2d 315, 317 (D. Del. 2003).  The court also held that the DNA Act did not violate either the separation of powers doctrine or the *ex post facto* clause of the United States Constitution.  *Id.* at 324.  The court ordered Sczubelek to report by May 9, 2003, to a phlebotomist to have his blood taken.

Sczubelek filed his notice of appeal on April 14, 2003. On April 15, he moved the District Court to stay its order pending this appeal.  In support of his motion to stay, Sczubelek asserted that if he were to "be required to submit to the taking of his blood for the purposes of obtaining a DNA sample prior to the resolution of his appeal, it would moot the

4

issues raised in his appeal." On April 16, the District Court issued an order granting the stay. The next day, the government filed its opposition to Sczubelek's request for a stay, arguing that Sczubelek could petition the court to have his DNA information expunged from CODIS in the event he prevailed on appeal.

On October 5, 2003, Sczubelek's term of supervised release ended. The United States Probation Office for the District of Delaware sent Sczubelek a letter notifying him that his term of supervised release had been terminated and that he had satisfied all terms and conditions of his supervised release. On January 26, 2004, Sczubelek filed a motion to dismiss his appeal, asserting that the case is now moot because he is no longer on supervised release.

## II. JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction pursuant to 18 U.S.C. § 1291.

We exercise plenary review over jurisdictional issues, including whether this case is moot. *See Belitskus v. Pizzingrilli*, 343 F.3d 632, 639 (3d Cir. 2003). We also exercise plenary review over the District Court's resolution of the constitutional issues Sczubelek raises in his appeal. *United States v. Ledesma-Cuesta*, 347 F.3d 527, 530 (3d Cir. 2003).

## IV. DISCUSSION

### A.    Mootness

Sczubelek argues that his appeal is moot because, even if the government prevails, the District Court no longer has jurisdiction over him to collect a DNA sample. In view of the fact that the DNA Act authorizes the collection of a DNA sample only from prisoners, parolees, and individuals on

5

probation and supervised release and Szculebek is no longer on supervised release, he asserts that the government has no authority under the DNA Act to collect the sample from him. The government contends on the other hand that, pursuant to 18 U.S.C. § 3583(i), the District Court's jurisdiction to enforce an order it entered during Sczubelek's supervised release survives the expiration of his term of supervised release.

Under Article III, § 2, of the United States Constitution, we have the ability to entertain only cases and controversies. "Article III requires that an actual controversy exist through all stages of litigation, including appellate review." *United States v. Kissinger*, 309 F.3d 179, 180 (3d Cir. 2002). A case should be dismissed as moot where "developments occur during the course of adjudication that eliminate a plaintiff's personal stake in the outcome of a suit or prevent a court from being able to grant the requested relief . . .." *Morris v. Nationalist Movement*, 273 F.3d 527, 533 (3d Cir. 2001).

Here, the "development" which raises the issue of mootness is Sczubelek's discharge from supervised release. If the government no longer has the authority to collect a DNA sample from Sczubelek, there is no need to determine the constitutionality of taking that sample. We agree with the government, however, that, even though Sczubelek's term of supervised release has expired, the District Court retains jurisdiction pursuant to 18 U.S.C. § 3583(i) to adjudicate a violation of his supervised release. Section 3583(i), entitled "Delayed revocation," provides:

> The power of a court to revoke a term of supervised release for violation of a condition of supervised release, and to order the defendant to serve a term of imprisonment . . . extends beyond the expiration of the term of supervised release for any period reasonably necessary for

6

> the adjudication of matters arising before its
> expiration if, before its expiration, a warrant or
> summons has been issued on the basis of an
> allegation of such a violation.

18 U.S.C. § 3583(i).

Even though this is the first opportunity we have had to address this issue in the context of an individual on supervised release, we have addressed similar challenges in the context of parole and probation. *See Franklin v. Fenton*, 642 F.2d 760 (3d Cir. 1980); *United States v. Bazzano*, 712 F.2d 826 (3d Cir. 1983). In *Franklin*, we rejected the defendant's argument that it was unlawful to execute a warrant after his parole ended. We noted that "[s]ince the original warrant was issued within the petitioner's original term, it could be executed thereafter." 642 F.2d at 764. In *Bazzano*, we decided that as long as formal revocation proceedings begin within a defendant's term of probation, a district court could revoke probation after the term expired. 712 F.2d 826, 835 (1983). We observed:

> It is difficult to think of a reason why a court
> should arbitrarily lose jurisdiction at the end of
> the five-year statutory period when the alleged
> violation took place within the five-year period
> and the probationer was formally notified within
> that period that the Government would seek to
> revoke his probation.

*Id.*

In the context of supervised release, our sister courts of appeals have reached the same conclusion. Even before Congress added subsection (i) to § 3583 in 1994, the Courts of Appeals for the Fourth and Ninth Circuits held that, even if the term of supervised release had expired, a district court could hold a hearing and revoke the defendant's supervised

7

release as long as some formal revocation proceeding had begun within the term of supervised release – whether it be a warrant, summons, an order to show cause, or a petition charging a violation of supervised release. *See United States v. Neville*, 985 F.2d 992, 995-96 (9th Cir. 1993) (reasoning that "[t]he logical inference is that Congress expected some time to pass between the time a supervised release violation is discovered and the time supervised release is actually revoked."); *United States v. Barton*, 26 F.3d 490 (4th Cir. 1994) (noting that "[i]f the district court were to lose jurisdiction upon the lapse of the term of supervised release, persons who violated the conditions of their release near the end of the supervisory period would be immune to revocation.").

After Congress added subsection (i), the courts of appeals began explicitly relying on § 3583(i) in their decisions upholding district courts' jurisdiction to revoke supervised release after terms had expired. *See United States v. Morales*, 45 F.3d 693, 701 (2d Cir. 1995) (noting that "the most likely purpose of the amendment was to make absolutely clear Congress' earlier intention that sentencing courts have the authority to hold hearings to revoke or extend supervised release after expiration of the original term if they issue a summons or warrant during the release period."); *United States v. Garrett*, 253 F.3d 443, 449 (9th Cir. 2001) (holding that "adjudication" "refers to the *federal* adjudication of the defendant's supervised release violations," and "the 'reasonably necessary' period of time . . . encompasses delays attributable to a defendant's incarceration on state charges."); *United States v. Naranjo*, 259 F.3d 379, 383 (5th Cir. 2001) (holding that subsection (i) "permits revocation based on *any* violation of a condition of supervised release occurring during the supervision term, even if *not* contained in a petition for revocation filed during that term, *so long as* a warrant or summons was issued during that term on the basis of *an*

8

*alleged violation*."); *United States v. Hondras*, 296 F.3d 601, 602 (7th Cir. 2002) (holding that subsection (i) allows a court to "revoke a defendant's supervised release even after the term of release has ended, so long as a valid warrant or summons was issued before the end of the period on the basis of an allegation that the release violated the terms of his release.").

We will follow this line of cases, and we conclude that, pursuant to 18 U.S.C. § 3583(i), the District Court retained jurisdiction here to adjudicate the DNA collection condition of Sczulebek's supervised release after his term had ended because the summons for the violation was issued during the supervised release period and the delay between the expiration of the term of supervised release and the adjudication of the District Court's DNA collection order has been reasonably necessary to determine the constitutionality of the order. *See Garrett*, 253 F.3d at 446. The probation office filed a "Petition on Probation and Supervised Release" on October 1, 2002, and the District Court issued a summons ordering Sczubelek to appear for a hearing, which was held on October 15, 2002, all while Sczubelek was on supervised release.

Sczubelek contends, however, that this last fact – the holding of the hearing during the period of supervised release distinguishes his case from the courts of appeals decisions cited above. The cited cases all involved hearings that were held after the terms of supervised release had expired. *See Neville*, 985 F.2d at 994 (hearing held 13 days after term expired); *Barton*, 26 F.3d at 491 (hearing held 17 days after term expired); *Morales*, 45 F.3d at 695 (hearing held approximately two months after term expired); *Garrett*, 253 F.3d at 445 (arrest warrant executed nine months after term expired and hearing held ten months after term expired); *Naranjo*, 259 F.3d at 381 (hearing held almost three years after term expired); *Hondras*, 296 F.3d at 602 (hearing held

9

eight months after term expired).  Sczubelek, however, overlooks the plain language of § 3583(i) which requires that a warrant or summons issue before the expiration of the term of supervised release but makes no mention of when the hearing on the violation must take place.  We find no requirement – explicit or implied –  in the statutory language which dictates that for § 3583(i) to come into effect, the hearing on the violation must be held after the expiration of the term of supervised release – indeed, such a requirement appears counterintuitive.  *See Bazzano*, 712 F.2d at 835 (holding that where hearing on probation violation held during term of probation, District Court properly revoked term of probation after the term expired).

Sczubelek insists, however, that the District Court should have "stayed" the expiration of his term of supervised release, citing Rule 38 of the Federal Rule of Criminal Procedure.  Rule 38 gives district courts the discretion to stay the commencement of a sentence of imprisonment, including a probation sentence, when the defendant chooses to appeal his sentence.  It is possible that a defendant might file a motion pursuant to Rule 38 to delay the start of a term of imprisonment for a violation of supervised release while that violation was being appealed.  In view of the language of § 3583(i), however, it is not necessary to invoke Rule 38 to maintain the jurisdiction of the district court to adjudicate a violation or to enforce the penalty for violation of supervised release. Because it is jurisdiction – not a delay in reporting for imprisonment – that is the issue before us, a stay of the expiration of supervised release was not necessary.

For the same reason, we find no merit in Sczubelek's argument that the government and the District Court had to have taken affirmative steps to extend his term of supervised release in order that the District Court might enforce its order if it was adjudicated to be constitutional.  Moreover, a term of supervised release cannot be extended beyond its maximum

10

authorized term.  *See* 18 U.S.C. § 3583(e)(2).  It is not evident from the record here whether the three year term of supervised release imposed on Sczubelek was the maximum authorized.  It is not necessary for us to make that determination, however, since jurisdiction over Sczubelek can be maintained under § 3583(i).

We conclude, therefore, that under the provisions of § 3583(i), because the summons for the DNA Act violation was issued during the term of supervised release, the District Court retained jurisdiction over Sczubelek to adjudicate that violation even after the expiration of the term of supervised release.  Accordingly, Sczubelek's appeal is not moot, and we will address the merits of his appeal.[1]

**B.    Fourth Amendment**

In 1994, Congress passed the Violent Crime Control and Law Enforcement Act, 42 U.S.C. §§ 13701-14223 (1994) (Crime Control Act).  The Crime Control Act authorized the Federal Bureau of Investigation to establish an index of DNA[2] samples from individuals convicted of crimes, from crime scenes, and from unidentified human remains.  42 U.S.C. § 14132(a)(1).  In response, the FBI created the Combined DNA Index System (CODIS).  CODIS "allows State and local forensics laboratories to exchange and compare DNA profiles electronically in an attempt to link evidence from crime scenes for which there are no suspects to DNA samples of

---

[1]  We will not address the *ex post facto* clause issue because Sczubelek did not appeal that portion of the District Court's decision.

[2]  DNA stands for deoxyribonucleic acid.  DNA molecules carry the genetic information of human beings.  DNA is unique to each individual, except in the case of identical twins.

convicted offenders on file in the system." H.R. REP. 106-900(I), at 8 (2000).

The DNA Act requires individuals in custody and individuals on release, parole, or probation to give a DNA sample if they are, or have been, convicted of a qualifying federal offense. 42 U.S.C. §§ 14135a(a)(1), (2). Bank robbery, one of the offenses for which Sczubelek was on supervised release, is a qualifying federal offense. *See id.* § 14135a(d)(1)(E). With the passage of the DNA Act, Congress also amended the supervised release statute. The amendment requires the giving of a DNA sample as an explicit condition of supervised release. *See* 18 U.S.C. § 3583(d). In the case of an individual on supervised release, parole, or probation, the probation office responsible for the supervision of such individual must arrange for the collection of the DNA sample. *See id.* § 14135a(a)(2). The probation office "may use or authorize the use of such means as are reasonably necessary to detain, restrain, and collect a DNA sample" from any individual who refuses to give a sample. *See id.* § 14135a(a)(4)(A). An individual who fails to give a DNA sample is guilty of a class A misdemeanor. *See id.* § 14135a(a)(5).

Once the collection facility obtains the DNA sample, it sends the completed test kit to the FBI laboratory for inclusion in CODIS. The DNA Act allows the DNA test results to be used only for purposes specified in the Crime Control Act. *See* 42 U.S.C. § 14135e(b). The Crime Control Act limits the disclosure of the test results to "criminal justice agencies for law enforcement identification purposes," for use "in judicial proceedings," and "for criminal defense purposes, to a defendant." *See id.* § 14132(b)(3). The DNA Act penalizes the disclosure of the sample or result to a person without authorization to receive it or the obtaining of a sample or result without authorization. *See id.* § 14135e(c). Furthermore, the Crime Control Act provides for the

12

expungement of DNA records from CODIS when a
conviction for a qualifying offense is overturned. *See id.* §
14132(d).

Sczubelek contends that the compelled extraction of
his blood to obtain a DNA sample violates his Fourth
Amendment right against unreasonable searches because it is
a search executed without individualized suspicion of any
criminal wrongdoing. The government concedes that the
extraction of blood is a search, but argues that the search is
constitutional under a traditional Fourth Amendment
reasonableness analysis. The government argues alternatively
that the search is reasonable under the special needs exception
to the warrant requirement.

The Fourth Amendment to the United States
Constitution provides that "[t]he right of the people to be
secure in their persons, houses, papers, and effects, against
unreasonable searches and seizures, shall be violated . . .."
Requiring Sczubelek to give a blood sample constitutes a
Fourth Amendment search. *Skinner v. Railway Labor
Executives' Ass'n*, 489 U.S. 602, 616 (1989) ("[T]his physical
intrusion, penetrating beneath the skin, infringes upon an
expectation of privacy that society is prepared to recognize as
reasonable."). "The ensuing chemical analysis of the sample
to obtain physiological data" is also a search covered by the
Fourth Amendment. *Id.*

The fundamental task of any Fourth Amendment
analysis is assessing the reasonableness of the government
search. *United States v. Knights*, 534 U.S. 112, 118 (2001).
If the search is reasonable, there is no constitutional problem,
for the Fourth Amendment only protects individuals from
unreasonable searches and seizures. *Skinner*, 489 U.S. at 619.
Determining whether a search is reasonable "'depends on all
of the circumstances surrounding the search or seizure and the
nature of the search or seizure itself,'" *Skinner*, 489 U.S. at
619 (citation omitted), and involves balancing "on the one

13

hand, the degree to which [the search] intrudes upon an individual's privacy and, on the other hand, the degree to which [the search] is needed for the promotion of legitimate governmental interests." *Knights*, 534 U.S. at 119 (alteration in original).

A balance is usually struck by requiring that a warrant be based on probable cause. *Skinner*, 489 U.S. at 619. However, "[n]either a warrant nor probable cause, nor, indeed any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance." *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 665 (1989). The Supreme Court has held that warrantless searches based on reasonable grounds can satisfy the Fourth Amendment's reasonableness requirements in certain circumstances. In special needs cases, the Court has held that warrantless searches without any individualized suspicion withstand Fourth Amendment scrutiny.

Starting our analysis with the special needs exception, in *Griffin v. Wisconsin,* the Supreme Court held that a warrantless search of a probationer's home, conducted entirely by a probation officer pursuant to a state regulation that required probation searches to be based upon reasonable grounds, withstood Fourth Amendment scrutiny. 483 U.S. 868 (1987). The Court reasoned that probation officers have a "special need" to supervise probationers, apart from a normal law enforcement need, that justifies a departure from the normal warrant and probable cause requirements. *Id.* at 873-74. Probationers, the Court observed, do not enjoy the same liberties that ordinary citizens enjoy. *Id.* at 874. The Court also noted that the goals of probation are to rehabilitate probationers – who are more likely to engage in criminal wrongdoing than ordinary citizens – and to protect the community from harm. *Id.* at 875-79. Finally, the Court believed that imposing a warrant requirement for supervisory searches would significantly interfere with the goals of

14

probation by reducing both the deterrent effect of the supervision and the ability of probation officials to act swiftly to protect the probationer from harming himself or others. *Id.* *Griffin*'s holding rested in part on the distinction between searches conducted by probation officers and investigative searches conducted by law enforcement officers. *Id.* at 879 ("[W]e deal with a situation in which there is an ongoing supervisory relationship – and one that is not, or at least not entirely, adversarial – between the object of the search and the decisionmaker."). The Court concluded that "its 'special needs' holding made it 'unnecessary to consider whether' warrantless searches of probationers were otherwise reasonable within the Fourth Amendment." *United States v. Knights*, 534 U.S. 112, 117-18 (2001) (quoting *Griffin*, 483 U.S. at 880).

The issue of a warrantless search of a probationer arose again in *Knights*. Here, however, the search was by the police in connection with the investigation of a crime, rather than a search by a probation officer performing his supervisory duties. The Court upheld the warrantless search of the probationer's home by a police officer upon reasonable suspicion and based its decision, not on *Griffin's* special needs holding, but on an examination of "'the totality of the circumstances.'" 534 U.S. at 118 (quoting *Ohio v. Robinette*, 519 U.S. 33, 39 (1996)). The "salient circumstance" in the Court's view was the probation search condition, which the probationer knew about when he was placed on probation. *Id.* at 118. The Court concluded that the probationer had a "significantly diminished" expectation of privacy because he was informed of the search condition.[3] *Id.* at 119-120. In

---

[3] The Court in *Knights* distinguished the probation search requirement from the circumstances in *Griffin*. *Knights*, 534 U.S. at 117, n.2. In *Griffin*, the regulation authorizing the search was not a condition of probation and was promulgated after

15

considering the government's interests, the Court found that "the recidivism rate of probationers is significantly higher than the general crime rate" and "probationers have even more of an incentive to conceal their criminal activities and quickly dispose of incriminating evidence." *Id.* at 120. Therefore, the Court concluded, the government's "interest in apprehending violators of the criminal law, thereby protecting potential victims of criminal enterprise, may . . . justifiably focus on probationers in a way that it does not on the ordinary citizen." *Id.* at 121.

The courts of appeals that have addressed the constitutionality of the DNA Act or of similar state statutes, while unanimous in their decisions to uphold the statutes, are split as to whether to apply the *Knights* reasonableness standard or the *Griffin* special needs exception. The Fourth, Fifth and Ninth Circuit Courts of Appeals have utilized a reasonableness standard. *See Jones v. Murray,* 962 F.2d 302 (4th Cir. 1992) (upholding Virginia DNA statute); *Groceman v. United States*, 354 F.3d 411 (5th Cir. 2004) (relying on *Knights* to uphold the DNA Act); *Rise v. Oregon*, 59 F.3d 1556 (9th Cir. 1995), and *United States v. Kincade*, 2004 WL 1837840 __ F.3d ___ (9th Cir., 2004) (*en banc,* five judges endorsing the reasonableness standard; one, the special needs

---

Griffin was placed on probation. *See Griffin*, 483 at 870-71. Similar to *Griffin*, the DNA Act was enacted after Sczubelek began serving his term of supervised release. Therefore, unlike the probationer in *Knights*, Sczubelek was not informed of this condition at the imposition of his sentence of supervised release. Nevertheless, we do not find this fact material here. *See infra* and footnote 4. We note, moreover, that our conclusion here on the constitutionality of the DNA Act will apply to future probationers who have been informed of the DNA collection requirement at the time of the imposition of supervised release.

16

exception; and five dissenting). The Tenth Circuit Court of Appeals appears to be split. The court first analyzed the issue using a reasonableness analysis to uphold a Colorado DNA statute. *See Boling v. Romer*, 101 F.3d 1336 (10th Cir. 1997) (principally citing *Jones* and *Rise*). However, more recently, and without substantive analysis, the court relied on the special needs doctrine to uphold the DNA Act. *See United States v. Kimler*, 335 F.3d 1132 (10th Cir. 2003). The Second and Seventh Circuit Courts of Appeals have employed the special needs exception. *See Roe v. Marcotte*, 193 F.3d 72 (2d Cir. 1999) (upholding Connecticut DNA statute); *Green v. Berge*, 354 F.3d 675 (7th Cir. 2004) (upholding Wisconsin DNA statute). The District Court in this case upheld the constitutionality of the DNA Act under the special needs exception.

Because we conclude that the purpose for the collection of DNA goes well beyond the supervision by the Probation Office of an individual on supervised release, as was the situation in *Griffin*, we believe that it is appropriate to examine the reasonableness of the taking of the sample under the more rigorous *Knights* totality of the circumstances test rather than the *Griffin* special needs exception. We conclude that, under the totality of the circumstances, the taking of a DNA sample from an individual on supervised release is not an unreasonable search. We explain our reasons below.

First, the intrusion of a blood test is minimal. *See Skinner*, 489 U.S. at 625 (blood tests are commonplace, safe, and "'do not constitute an unduly extensive imposition on an individual's privacy and bodily integrity.'") (quoting *Winston v. Lee*, 470 U.S. 753, 762 (1985)). While this slight intrusion into an ordinary citizen's privacy is unconstitutional, individuals on supervised release, like individuals on probation, "do not enjoy the absolute liberty to which every citizen is entitled." *Knights*, 534 U.S. at 119 (internal quotations and citations omitted).

17

Sczubelek, as an individual on supervised release, has a reduced right to privacy – and in particular to privacy of identity.  When Sczubelek was arrested, he was photographed and his fingerprints were taken.  After his conviction of a felony, his identity became a matter of compelling interest to the government, and these marks of identification, the fingerprints and the photographs, became a permanent record.  Sczubelek can no longer assert a privacy interest in these means of identification.  His DNA is a further – and in fact a more reliable – means of identification.  *See Jones*, 962 F.2d 302 ("[W]hen a suspect is arrested upon probable cause, his identification becomes a matter of legitimate state interest and he can hardly claim privacy in it."); *Groceman*, 354 F.3d at 413-14 ("Though, like fingerprinting, collection of a DNA sample for purposes of identification implicates the Fourth Amendment, persons incarcerated after conviction retain no constitutional privacy against their correct identification."); *Rise*, 59 F.3d at 1560 (convicted felons "do not have the same expectations of privacy in their identifying genetic information.").  Individuals on supervised release cannot reasonably expect to keep information bearing on their physical identity from government records.  Thus, for criminal offenders the privacy interests implicated by the collection of DNA are minimal.[4]    Moreover, we agree with the

---

[4]  In *Knights*, the probation search requirement was an express condition of probation at the time the probationer was sentenced.  *Knights*, 534 U.S. at 119.  Here, the condition of giving a DNA sample was not an express condition of Sczubelek's supervised release because the DNA Act was enacted shortly after Sczubelek began serving his term.  Nevertheless, because Sczubelek already had a reduced expectation of privacy with respect to his identity and the search was to obtain a statutorily mandated means of identifying an individual, we conclude that the fact that the giving of a DNA

18

government that it has a compelling interest in the collection of identifying information of criminal offenders. A DNA database promotes increased accuracy in the investigation and prosecution of criminal cases. It will aid in solving crimes when they occur in the future. Equally important, the DNA samples will help to exculpate individuals who are serving sentences of imprisonment for crimes they did not commit and will help to eliminate individuals from suspect lists when crimes occur.[5] While the presence of Sczubelek's DNA in CODIS may inculpate him in the future, it may also exonerate him. The interest in accurate criminal investigations and prosecutions is a compelling interest that the DNA Act can reasonably be said to advance. The court in *Jones* explained:

> It is a well recognized aspect of criminal conduct that the perpetrator will take unusual steps to conceal not only his conduct, but also his identity. Disguises used while committing a crime may be supplemented or replaced by changed names, and even changed physical features. Traditional methods of identification

--------

sample was not originally an express condition of Sczubelek's supervised release is not significant.

[5] DNA testing has changed the criminal justice system. All 50 states and the federal government have enacted DNA collection and database statutes. To date, 143 people have been exonerated by DNA evidence, thirteen of whom were sentenced to death. 38 states have enacted some form of a DNA statute, allowing for postconviction DNA testing, compensation for wrongful conviction, or preservation of evidence. In 2003, the House of Representatives passed the Advancing Justice Through DNA Technology Act (HR 3214), a federal statute which would give prisoners the right to petition for DNA testing in support of a claim of innocence.

by photographs, historical records, and
fingerprints often prove inadequate. The DNA,
however, is claimed to be unique to each
individual and cannot, within current scientific
knowledge, be altered. The individuality of the
DNA provides a dramatic new tool for the law
enforcement effort to match suspects and
criminal conduct. Even a suspect with altered
physical features cannot escape the match that
his DNA might make with a sample contained
in a DNA bank, or left at the scene of a crime
within samples of blood, skin, semen or hair
follicles. The governmental justification for this
form of identification, therefore, relies on no
argument different in kind from that
traditionally advanced for taking fingerprints
and photographs, but with additional force
because of the potentially greater precision of
DNA sampling and matching methods.

962 F.2d at 307.

An additional government interest is promotion of "the
two primary goals of probation – rehabilitation and protecting
society from future criminal violations." *Knights*, 534 U.S. at
119. As with individuals on probation, individuals on
supervised release are associated with higher recidivism rates.
*See Griffin*, 483 U.S. at 880 (probationers are "in need of
rehabilitation and [are] more likely than the ordinary citizen to
violate the law."); *see also Knights*, 534 U.S. at 120 ("The
recidivism rate of probationers is significantly higher than the
general crime rate."). Individuals on supervised release, just
as probationers, no doubt would like to keep their identifying
information hidden from public access:

[P]robationers have even more of an incentive
to conceal their criminal activities and quickly

20

> dispose of incriminating evidence than the
> ordinary criminal because probationers are
> aware that they may be subject to supervision
> and face revocation of probation, and possible
> incarceration, in proceedings in which trial
> rights of a jury and proof beyond a reasonable
> doubt, among other things, do not apply . . ..

*Knights*, 534 U.S. at 120.  Moreover, collection of identifying information will indirectly promote the rehabilitation of criminal offenders by deterring them from committing crimes in the future.

Furthermore, the collection of DNA samples will protect society.  A recent Attorney General report prepared for Congress indicates that at least seven deaths, 89 rapes, 14 rape/deaths, nine sexual assaults, 14 robberies, three assaults, one burglary, and several property crimes could have been prevented had a DNA sample been taken earlier.  *National Forensic DNA Study Report* at 49-66 (December 12, 2003).

Sczubelek argues, however, that the Supreme Court's decision in *Knights* requires us to find the DNA Act unconstitutional because it requires the submission of a DNA sample without individualized suspicion of criminal wrongdoing.  *Knights*, however, does not establish the constitutional floor below which searches are unconstitutional.  The Court made clear that it was not deciding "whether the probation condition so diminished, or completely eliminated, . . . [the probationer's] reasonable expectation of privacy . . . that a search by a law enforcement officer *without any individualized suspicion* would have satisfied the reasonableness requirement of the Fourth Amendment."  *Knights* at 120, n.6 (emphasis added).  We conclude, therefore, that the *Knights* totality of the circumstances test would permit a finding that the DNA Act, mandating collection of DNA from a criminal offender

21

without individualized suspicion, complies with the Fourth
Amendment's reasonableness requirements.  In reaching this
decision, we find support in the Court's holding in *Skinner v.
Railway Labor Executives' Assoc.*:

> [A] showing of individualized suspicion is not a
> constitutional floor, below which a search must
> be presumed unreasonable . . . . In limited
> circumstances, where the privacy interests
> implicated by the search are minimal, and where
> an important governmental interest furthered by
> the intrusion would be placed in jeopardy by a
> requirement of individualized suspicion, a
> search may be reasonable despite the absence of
> such suspicion.

489 U.S. 602, 624 (1989).  This is one of those circumstances.
As with fingerprinting, the Fourth Amendment does not
require additional individualized suspicion in order to take a
blood sample from a criminal offender such as Sczubelek.

Moreover, there are other factors, in addition to the
insignificance of the intrusion, Sczubelek's reduced
expectation of privacy, and the Government's compelling
interests, which convince us that the DNA Act authorizes a
search that meets the reasonableness requirements of the
Fourth Amendment.  First, there is no discretion on the part of
probation officers as to who is required to give a DNA
sample.  The DNA Act clearly delineates the offenses for
which a sample must be taken and from whom the sample
must be taken.  *See* 42 U.S.C. § 14135a(a)(1), (2).  Only the
Bureau of Prisons and the Probation Office have the authority
to take the sample.  *See id.*  This limited discretion helps to
alleviate concerns over probable cause and individualized
suspicion.  The permissible uses authorized by the DNA Act
are similarly specified.  The sample must be forwarded for
entry into CODIS and may only be used for law enforcement

22

identification purposes, in judicial proceedings, and for criminal defense purposes. *See id.* § 14135e(b); 42 U.S.C. § 14132(b)(3). The DNA Act also punishes the unauthorized disbursement or obtaining of DNA samples. *See* 42 U.S.C. § 14135e(c). Finally, the Act provides for expungement of the DNA information from CODIS upon reversal or dismissal of conviction. *See id.* § 14132(d).

In view of the importance of the public interests in the collection of DNA samples from criminal offenders for entry into a national DNA database and the degree to which the DNA Act serves to meet those interests, balanced against the minimal intrusion occasioned by giving a blood sample and the reduced privacy expectations of individuals on supervised release, we conclude that the collection of DNA samples from individuals on supervised release, pursuant to the DNA Act, is not an unreasonable search in violation of the Fourth Amendment.

## C.    Separation of Powers

Sczubelek also argues that the DNA Act violates the separation of powers doctrine because it turns probation officers into "adjunct law enforcement officers" by mandating that they seize DNA samples by force if necessary. Sczubelek claims that the DNA Act requires the U.S. Probation Office to exceed its role as a neutral arm of the judiciary by adding adversarial and law enforcement aspects to the supervisory role it already holds.

The District Court rejected Sczubelek's separation of powers challenge, reasoning that a probation officer's duties, which include supervising the probationer to assure compliance with conditions, taking urine samples to screen for drug use, and reporting violations of conditions to the court, have a law enforcement aspect that is "a result of the practical function of governing that 'mandates some overlap

23

of responsibility and interdependence among the branches.'"
*Sczubelek*, 255 F.Supp. 2d at 324 (quoting *Mistretta v. United States*, 488 U.S. 361, 381 (1989).

   While "the separation of governmental power into three coordinate branches is essential to the preservation of liberty," *Mistretta*, 488 U.S. at 380, the Supreme Court has advised that the separation of powers doctrine does not support "the notion that the three Branches must be entirely separate." *Id.* Some convergence of the branches, interdependence, and flexibility are necessary in order for our country to govern itself effectively. *Id.* at 381.

   Law enforcement is an executive function, and probation officers serve a supervisory function for the judicial branch. *See United State v. Bermudez-Plaza*, 221 F.3d 231, 234 (1st Cir. 2000) ("In reporting suspected violations, and even in recommending a particular course of action, the probation officer is simply performing her statutory duty to assist the court in its supervision of individuals on supervised release, which supervision is an integral part of the courts' quintessentially judicial sentencing responsibility."); *see also* 18 U.S.C. § 3603 (requiring probation officers to supervise probationers, report to the Administrative Office of the United States Courts, and report violations to the court). In *Mistretta*, the Supreme Court recognized the creation of "the Administrative Office of the United States Courts whose myriad responsibilities include the administration of the entire probation service." 488 U.S. at 389-90. The courts of appeals have rejected various separation of powers challenges to actions of probations officers, including their role in initiating the revocation of supervised release and recommending a course of action to the court, *Bermuda-Plaza*, 221 F.3d at 234-35; *United States v. Amatel*, 346 F.3d 278, 279-80 (2d Cir. 2003); *United States v. Mejia-Sanchez*, 172 F.3d 1172, 1176 (9th Cir. 1999); *United States v. Davis*, 151 F.3d 1304, 1306-08 (10th Cir. 1998), and their role in the

24

preparation of presentence reports, *United States v. Washington*, 146 F.3d 219, 223 (4th Cir. 1998); *United States v. Woods*, 907 F.2d 1540, 1543-44 (5th Cir. 1990); *United States v. Belgard*, 894 F.2d 1092, 1096-99 (9th Cir. 1990).

The collection of DNA samples does not transform probation officers into "adjunct law enforcement officers."[6] The probation officers are charged by statute with organizing the collection of DNA samples and submission of DNA test kits to the FBI laboratory. The probation officers have no involvement in either analyzing the samples, entering the samples into CODIS, or investigating crimes. Furthermore, law enforcement agencies are not involved with the actual search itself. It is only after the testing facility turns over the test kits to the FBI that law enforcement involvement begins.

Sczubelek argues that the probation office's collection of DNA samples does not serve a probationary purpose but instead serves a law enforcement purpose. Indeed, it does serve a law enforcement purpose because the DNA samples are turned over to the FBI for use in solving crimes. Giving probation officers the authority to "detain" and "restrain" in order to collect DNA, *see* 42 U.S.C. §14135a(a)(40(A), also adds an element of law enforcement, but this authority is similar to the authority granted by 18 U.S.C. § 3606 to probation officers to arrest probationers for violations of probation. That arrest power has never been successfully challenged. *See, e.g.*, *United States v. Amatel*, 346 F.3d 278, 278-79 (2d Cir. 2003).

---

[6] The term "adjunct law enforcement officer" derives from the Supreme Court's decision in *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 327 (1979). *Lo-Ji Sales* involved a Fourth Amendment challenge to a search, not a separation of powers challenge. In any event, the judge in *Lo-Ji Sales* became "a member, if not the leader, of the search party which was essentially a police operation." *Id.* at 327.

Despite the law enforcement aspects of the U.S. Probation Office's role in the collection of DNA samples, we conclude that the collection of DNA samples falls within the office's supervisory function. As discussed above, the two primary goals of supervised release are rehabilitation and the prevention of harm to others. The condition of giving a DNA sample furthers both goals. A probation officer's collection of DNA samples is as conducive to the officer's supervisory function as the other conditions of supervised release aimed at preventing offenders from using drugs, from hurting themselves, or from hurting others.

Moreover, even if collecting DNA samples were beyond the probation office's supervisory function – and we do not believe that it is – it does not necessarily follow that there is a separation of powers violation. There would also have to be an encroachment on the Executive Branch, and that encroachment is missing here. Giving probation officers the power to collect DNA samples does not interfere with the Executive Branch's ability to make law enforcement decisions and perform law enforcement functions. Probation officers play no part in how the DNA information is used after the test kits are sent to the FBI. "[T]here is no possibility that . . . [allowing probation officers to collect DNA samples] will curtail the scope of the official powers of the Executive Branch." *Clinton v. Jones*, 520 U.S. 681, 701 (1997).

Finally, giving probation officers the power to collect DNA samples does not compromise the integrity of the Judicial Branch. Probation officers have no discretion in the matter – they must coordinate the collection of DNA samples from every parolee, probationer, or individual on supervised release who is, or has been, convicted of a qualifying federal offense. 42 U.S.C. § 14135a(a)(1), (2). If this condition is violated, the probation officer must report the violation to the court, and the court remains the final arbiter. Finally, the collection of DNA samples is not a task that is "more properly

accomplished by [other] branches." *Mistretta*, 488 U.S. at 383 (quoting *Morrison v. Olson*, 487 U.S. 654, 680-81 (1988)).

We will affirm the District Court's rejection of Sczubelek's separation of powers challenge to the DNA Act.

## V. CONCLUSION

For the reasons stated above, we will affirm the District Court's order requiring Sczubelek to report to a phlebotomist and give a DNA sample, and we will remand this case to the District Court for further proceedings consistent with this opinion.

McKee, Circuit Judge, Dissenting.

I must respectfully dissent from the majority's analysis insofar as my colleagues conclude that the coerced collection of Sczubelek's blood for DNA analysis "is not an unreasonable search in violation of the Fourth Amendment." *See* Maj. Op. 25.[7] "History teaches that grave threats to liberty often come in times of urgency, when constitutional rights seem too extravagant to endure." *Skinner v. Railway Labor Executives, Assoc.*, 489 U.S. 602, 635 (1989) (Marshall, J. dissenting).[8] As I shall explain, the rights guaranteed under the Fourth Amendment can not be jettisoned

---

[7] I agree with the majority's conclusion that this appeal is not moot and that the DNA Act does not violate the separation of powers doctrine.

[8] Justice Marshall also noted that, "when we allow fundamental freedoms to be sacrificed in the name of real or perceived exigency, we invariably come to regret it." *Skinner*, 489 U.S. at 635.

27

as easily as the majority's analysis of the  DNA Analysis Backlog Elimination Act of 2000, 42 U.S.C. §§ 14135-14135e (2001 Supp) ("DNA Act"), suggests.

## I. Introduction.

"Chemical analysis of . . . blood[] can reveal a host of private medical facts . . . including whether [someone] is epileptic, pregnant, or diabetic." *Skinner*, 489 U.S. at 617. The Supreme Court recognized that before science had unlocked the mystery of the DNA molecule. Today we may be just beginning to appreciate the wealth of personal information that may be encoded inside our blood. Under the DNA Act, the government can seize that information and store it in the  Combined DNA Index System ("CODIS" or "DNA database"), for as long as the government wishes.  The search occurs even though the government may concede that the person searched has become a law abiding citizen who is a productive and contributing member of his/her community.

## II. Discussion.

My colleagues believe that this DNA analysis is only minimally invasive.   Nevertheless, "it is obvious that this physical intrusion, penetrating beneath the skin, infringes an expectation of privacy . . .".  *Skinner*, 489 U.S. at 616 (internal quotation marks omitted).  Furthermore, the "physical intrusion, penetrating beneath the skin," is only part of the intrusion that we sanction today. "The ensuing chemical analysis of the sample to obtain physiological data is a further invasion of the tested [individual's] privacy interests." *Id.*[9]

---

[9] My colleagues may conclude that the constitutionality of the analysis  is  subsumed  within,  and  legitimized  by,  the

28

The Supreme Court has never struck the Fourth Amendment balance in favor of a law enforcement intrusion that was not based on some level of individualized suspicion. *Chandler v. Miller*, 520 U.S. 305, 313 (1997) ("To be reasonable under the Fourth Amendment, a search ordinarily must be based on individualized suspicion of wrongdoing."). "In limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion." *Skinner*, 489 U.S. at 624. However, none of those circumstances are present here, and an examination of the Supreme Court's Fourth Amendment jurisprudence establishes that the professed governmental interest in Sczubelek's identity does not (without more) justify the intrusion ordained by the DNA Act.

## A. The Supreme Court Precedent.
### 1. *Griffin v. Wisconsin.*

In *Griffin v. Wisconsin*, 483 U.S. 868 (1987), the Court upheld a probation officer's warrantless search of a probationer's apartment after police informed the probation office that the probationer may have guns there. The search was conducted pursuant to a state regulation that authorized warrantless searches of a probationer's home "as long as [the]

---

governmental interests justifying the drawing of blood in the first instance. However, I do not think we can so easily dismiss the separate intrusion of allowing the government to peer inside someone's DNA and permanently store the information to be found there. There is a significant distinction between that and the intrusion each of us accepts when we visit our physician and have our blood drawn. *See*, discussion infra at 30.

supervisor approves and as long as there are 'reasonable
grounds' to believe the presence of contraband - including
any item that the probationer cannot possess under the
probation conditions." 483 U.S. at 871.  The Court upheld the
warrantless search while reaffirming that "[a] probationer's
home, like anyone else's, is protected by the Fourth
Amendment's requirement that searches be 'reasonable.'" *Id*.
at 873.

Reasonableness is usually established by satisfying the
warrant requirement.  A search pursuant to a warrant is
"supported by probable cause, as the Constitution says
warrants must be." *Id.* (parenthesis omitted).   However, the
Court based its ruling on a limited exception to that general
rule that applies when "special needs, beyond the normal need
for law enforcement, make the warrant and probable-cause
requirement impracticable." *Id*. (internal quotation marks
omitted).

The search of Griffin's apartment did not offend the
Fourth Amendment because "[a] State's operation of a
probation system, . . . presents 'special needs' beyond normal
enforcement that may justify departures from the usual
warrant and probable-cause requirements." *Id*. at 873-4.
Probationers, the Court noted, enjoy only a "'conditional
liberty properly dependent on the observance of special
[probation] restrictions.'" *Id*. at 874 (brackets in original).
The restrictions the Court alluded to, like the restrictions
relied upon by my colleagues here, "are meant to assure that
the probation serves as a period of genuine rehabilitation and
that the community is not harmed by the probationer's being
at large.." *Id*. at 875.  As noted above, the regulation in *Griffin*
authorized warrantless searches to insure that a probationer
was complying with the terms of his/her probation.  Thus,
although the probation officer entered based upon information

30

Griffin had a gun, the entry was nevertheless consistent with Griffin's probationary supervision. It therefore served a supervisory function sufficiently removed from a law enforcement purpose to survive Fourth Amendment scrutiny.

That "supervision" was a special need "permitting the [state] a degree of impingement upon privacy that would not be constitutional if applied to the public at large." *Id*. The Court's analysis did not stop there, however, because the Court still had to determine if the search, though permissible, exceeded the "permissible degree" of intrusion consistent with the supervisory need. *Id*. ("The permissible degree is not unlimited."). The Court concluded that the warrantless search did not exceed the permissible limits.

> A warrant requirement would interfere . . . with the probation system, setting up a magistrate rather than the probation officer as the judge of how close a supervision the probationer requires. Moreover, the delay . . . would make it more difficult for probation officials to respond quickly to evidence of misconduct, and would reduce the deterrent effect that the possibility of expeditious searches would otherwise create. . .

*Id.* at 876 (internal citations omitted). The Court also stressed the unique role of a probation officer:

> Although a probation officer is not an impartial magistrate, neither is he the police officer who normally conducts searches against the ordinary citizen. He is an employee of the State Department of Health and Social Services who, while assuredly charged with protecting the

31

public interest, is also supposed to have in mind
the welfare of the probationer.

*Id*. Citing the applicable probation regulations, the Court
noted that probation officers "'[p]rovid[e] individualized
counseling designed to foster growth and development of the
client as necessary,' . . . and '[m]onito[r] the client's progress
where services are provided by another agency and evaluat[e]
the need for continuation of the services.'" *Id*. at 876-7
(internal citations omitted). That is hardly the dynamic driving
the intrusion here.

Two years after deciding *Griffin*, the Supreme Court
decided *Skinner*. There, the Court explained that,
notwithstanding any suggestion in *Griffin* to the contrary,  the
special needs doctrine does not extend to intrusions that are
intended to further the need of law enforcement.

### 2. *Skinner v. Railway Labor Executives, Assoc.*

In *Skinner v. Railway Labor Executives, Assoc.*, 489
U.S. 602 (1989), labor unions representing railroad employees
challenged regulations promulgated by the Federal Railroad
Administration ("FRA") requiring certain railroad employees
to provide blood and urine specimens for drug and alcohol
analysis following rail accidents.  The unions alleged that the
warrantless seizure of blood and urine violated the Fourth
Amendment.  The Supreme Court agreed that the "compelled
intrusio[n] into the body for blood to be analyzed . . . "
constituted a search under the Fourth Amendment. 489 U.S. at
616 (citing *Schmerber v. California,* 384 U.S. 757, 767-768
(1966)). The Court nevertheless concluded that the searches
were permissible under the "special needs" doctrine. The
Court explained: "[w]hen faced with such special needs [as
railroad safety], we have not hesitated to balance the

32

governmental and privacy interests to assess the practicality of the warrant and probable-cause requirements in the particular context." 489 U.S. at 619. The Court balanced the need for rail safety against the intrusion resulting from the blood and urine analysis, and concluded the need justified the suspicionless intrusion.

> The Government's interest in regulating the conduct of railroad employees to ensure safety, like its supervision of probationers or regulated industries, or its operation of a government office, school, or prison, likewise presents *special needs beyond normal law enforcement* that may justify departures from the usual warrant and probable-cause requirements.

489 U.S. at 620 (quoting *Griffin*, 483 U.S. at 873-874) (emphasis added) (internal quotation marks omitted).

The blood and urine analysis there was intended "not to assist in the prosecution of employees, but rather 'to prevent accidents and casualties in railroad operations that result from impairment of employees by alcohol or drugs.'" *Id*. at 621 (citing 49 C.F.R.§ 219.1(a) (1987)). The Court also reaffirmed the importance of the warrant requirement and individualized suspicion in other contexts.

> Our cases indicate that even a search that may be performed without a warrant must be based, as a general matter, on probable cause to believe that the person to be searched has violated the law. When the balance . . . precludes insistence on a showing of probable cause, we have usually required some quantum of individualized suspicion.

33

*Id.* at 624 (internal quotations and citations omitted).

The requirement of "individualized suspicion" has only yielded "where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion . . .". *Id.* at 624. However, that interest must be real and it must be other than the general need of enforcing the law. *Chandler v. Miller*, 520 U.S. 305 (1997).

### 3. *Chandler v. Miller.*

In *Chandler,* candidates for state office challenged a Georgia statute that required certain candidates to certify that they had undergone urine analysis and tested negative for controlled substances prior to qualifying for the election. The state sought to justify the requirement by asserting a special need to insure the integrity and judgment of its elected officials even though it could not point to a history of its elected officials being impaired or abusing controlled substances while in office.

Despite the absence of a demonstrable problem, the Court of Appeals for the Eleventh Circuit upheld the intrusion based upon candidates' diminished expectation of privacy, the importance of the public trust, and the extent to which "the perils of drug use" could interfere with an elected official's duties and the public's confidence in government. 520 U.S. at 312 ("candidates for high office must expect the voters to demand some disclosures about their physical, emotional, and mental fitness for the position.").[10]

_____

[10] The Court of Appeals had reasoned that "[c]andidates for public office . . . are subject to relentless scrutiny - by their peers, the public, and the press. Their day-to-day conduct

The intrusion was relatively minor compared to the intrusion that had been approved in *Skinner* because, under the Georgia statute, a candidate could provide a urine specimen taken in the privacy of his/her own office and submit it to any certified testing facility.  The candidate also retained the right to refuse to disclose the results of the analysis and could instead terminate his/her candidacy.  In addition, unlike here, the "drug test . . . would reveal only the presence or absence of indicia of the use of particular drugs, *and not any other information about the health of the candidate*." *Id*.  312 (emphasis added).

The Supreme Court reversed the decision of the Court of Appeals. The Supreme Court held that, notwithstanding the state's professed "special need," the candidates' diminished expectation of privacy, or the limited nature of the intrusion, the requirement was nevertheless inconsistent with the Fourth Amendment.  The Court reiterated the importance of "individualized suspicion of wrongdoing," and the limits of the "special needs" doctrine.  *Id*.  at 312-313.  Rather than relying upon the state's assertion of a special need, the Court undertook "a context-specific inquiry, examining closely the competing private and public interests advanced by the parties[]" *id*. at 314, to independently determine whether the force of the state's need justified the intrusive statute.

The Court reasoned that "the proffered special need for drug testing must be substantial - important enough to override the individual's acknowledged privacy interest, sufficiently vital to suppress the Fourth Amendment's normal requirement for individualized suspicion." *Id*. at 318.  Since the record there did not indicate "any . . . concrete danger demanding departure from the Fourth Amendment's main

---

attracts attention notably beyond the norm in the ordinary work environments." *Id*.  at 321.

rule," the Court held that the balance of interests tipped against the state notwithstanding a candidates' diminished expectation of privacy. *Id*. at 319.[11]

Given the teachings of *Chandler,* we are far too quick to allow the government's professed interest here to trump the need for individualized suspicion. Moreover, the Court's subsequent analysis in *City of Indianapolis v. Edmond*, 531 U.S. 32 (2000), teaches that the Fourth Amendment will not tolerate a "special need" that is intended to further the government's interest in law enforcement.

### 4. *City of Indianapolis v. Edmond.*

In *Edmond*, the City of Indianapolis initiated a program of vehicle checkpoints "in an effort to interdict unlawful drugs." 531 U.S. at 34. Officers stopped vehicles at roadblocks and asked for the driver's license and registration while looking to see if the driver might be impaired. The officer would conduct a very brief visual examination of the interior while remaining outside the vehicle and speaking with the driver. During this brief detention, another officer would walk a narcotics-detection dog around the outside of the vehicle to see if the dog alerted for the presence of a controlled substance. Police only conducted a more involved search if the driver consented or if they had reasonable

---

[11] The Court noted that "[t]he statute was not enacted, . . . in response to any fear or suspicion of drug use by state officials[]" and stated that "[a] demonstrated problem of drug abuse . . . would shore up an assertion of special need for a suspicionless general program." *Id*. at 319. However, for reasons I shall explain, even though my colleagues assert such a demonstrated need here, I do not believe the need asserted can justify the Orwelllian intrusion that is ushered in under the umbrella of the DNA Act.

36

suspicion based upon their initial observations or the behavior of the dog. *Id*. at 35.   Otherwise, the stops only lasted two to three minutes. *Id*. at 36.

Motorists challenged the checkpoint inspections in a class action in which they argued that the roadblocks violated the Fourth Amendment.   The Supreme Court agreed. Although the Court had previously suggested that a brief stop of motor vehicles

> with the purpose of verifying drivers' licenses and vehicle registrations would be permissible[,] [it had never] approv[ed] . . . a checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing . . . Rather, [the Court's] checkpoint cases . . . recognized only limited exceptions to the general rule that a seizure must be accompanied by some measure of individualized suspicion.

*Id*. at 38, 41.  In reviewing the challenge to the Indianapolis program, the Court stressed that it had recognized "only limited circumstances in which the usual rule does not apply." *Id*. at 37. Those limited circumstances include "certain regimes of suspicionless searches where the program was designed to serve 'special needs, beyond the normal need for law enforcement[.]" *Id*.

Although the Indianapolis checkpoints improved highway safety by removing impaired drivers from the highway, the Court "would not credit the general interest in crime control as justification for a regime of suspicionless stops." *Id*.  The Court had distinguished earlier suspicionless searches that had been upheld despite their law enforcement objective as follows:

37

> [s]ecuring the border and apprehending drunk
> drivers are, of course, law enforcement
> activities, and law enforcement officers employ
> arrests and criminal prosecutions in pursuit of
> these goals.  If we were to rest the case at this
> high level of generality, there would be little
> check on the ability of authorities to construct
> roadblocks for almost any conceivable law
> enforcement purpose.

*Id*. at 42 (internal citations omitted).[12]

My colleagues err because, contrary to the teachings of *Edmond*, they rest the governmental need here on too high a level of generality.  This is evident from the Supreme Court's holding in *Ferguson v. City of Charleston*, 532 U.S. 67 (2001).

### 5. *Ferguson v. City of Charleston.*

In *Ferguson,* the Court was called upon to decide if the Fourth Amendment could tolerate a state hospital's policy of informing police when blood or urine specimens of pregnant mothers tested positive for cocaine. The Court defined the issue as follows: "whether the interest in using the threat of

---

[12] The Court has also approved suspicionless searches in cases involving highway checkpoints used to search for illegal immigrants, *United States v. Martinez-Fuerte*, 428 U.S. 543 (1976), and drunk drivers, *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444 (1990).  These cases are inapposite, however, as they involve only a "slight" intrusion on the motorists subject to the stops, whereas here, the intrusion on Sczubelek is much greater.  *See Sitz*, 496 U.S. at 451 ("the measure of the intrusion on motorists stopped briefly at sobriety checkpoints – is slight.")

criminal sanctions to deter pregnant women from using cocaine can justify a departure from the general rule that an official nonconsensual search is unconstitutional if not authorized by a valid warrant." 532 U.S. at 70.

The state argued that safeguarding the health and life of the newborn was a "special need" and that the warrantless intrusion therefore did not offend the Fourth Amendment. The Court rejected that argument because the "special need" was driven by a law enforcement objective, thus requiring individualized suspicion. *Id*. The Court explained: "[t]he fact that positive test results were turned over to the police does not merely provide a basis for distinguishing . . . prior cases applying the 'special needs' balancing approach . . . . It also provides an affirmative reason for enforcing the strictures of the Fourth Amendment." *Id*. at 84. Although the state "repeatedly insisted [] [its] motive was benign rather than punitive[,] . . . [the] motive . . . [did not] justify a departure from Fourth Amendment protections, given the pervasive involvement of law enforcement . . . [The policy] was designed to obtain evidence of criminal conduct . . .". *Id*. at 85-6.  In *Ferguson*, unlike in *Chandler*, the Court did not dispute the gravity of the need.  It recognized the seriousness of cocaine abuse and its impact on fetal health as well as the health of the mother. However, the Court concluded, as it had in *Edmond,* that "'the gravity of the threat alone cannot be dispositive of questions concerning what means law enforcement officers may employ to pursue a given purpose.'" *Id*. at 86 (quoting *Edmond*, 531 U.S. at 42-43.).

Finally, my colleagues' rely heavily on *United States v. Knights,* 534 U.S. 112 (2001), in arguing that the governmental "interests" here are sufficient to sustain intrusive blood testing under the DNA Act.  However, when *Knights* is considered in context with *Griffin, Edmond,*

39

*Ferguson,* and *Chandler,* the constitutional infirmity of the DNA Act's intrusion becomes evident.

### 6. *United States v. Knights.*

Knight was a probationer. One of the terms of his probation required him to "[s]ubmit his . . . person, [and] property . . . to search at anytime, with or without a search warrant, . . . or reasonable cause by any probation officer or law enforcement officer." *Knights*, 534 U.S. at 114 (brackets in original).

Knights had been placed on probation after a power company filed a criminal complaint against him for theft of services. Shortly after that complaint had been filed, a fire broke out on the company's property, and suspicion immediately focused on Knights and a friend of his named "Simoneau." The suspicion was based on the timing of the fire as well as the fact that prior acts of vandalism coincided with Knights' court appearances on the theft of services complaint. In addition, a week before the fire, police had stopped Knights and Simoneau near one of the power company's gas lines and noticed pipes and gasoline in Simoneau's truck. During a visual inspection of the truck after the fire, police observed Molotov cocktails, gasoline, and two brass padlocks matching the description of padlocks that had been taken from the power plant the night of the fire.

Knowing that Knight's probation included the aforementioned condition allowing searches, police conducted a warrantless search of Knights' apartment and discovered several items connecting Knights to the fire. He was arrested and subsequently convicted of conspiracy to commit arson. The conviction was eventually appealed to the Supreme Court where Knights argued that the evidence seized during the warrantless search should have been suppressed.

40

The Supreme Court disagreed. The Court reasoned that the condition of Knights' probation was valid because it furthered the dual goals of rehabilitation and protecting society from future criminal violations. *Id.* at 120. That condition "significantly diminished Knights' expectation of privacy." *Id.*

As is apparent from the evidence I have briefly summarized, there was no real issue about whether the search was justified by a reasonable suspicion of Knights' involvement. Rather, the issue was whether the *warrantless* search of Knights' private residence, "pursuant to his probation condition, and supported by reasonable suspicion, satisfied the Fourth Amendment," given whatever expectation of privacy Knights retained. *Id.* at 114. The Court held that it did. *Id.* at 122.

As my colleagues note, the Court reasoned that concerns for a probationer's successful completion of probation, and the fact that probationers are more likely to commit crimes "than an ordinary member of the community," allowed the state to "justifiably focus on probationers in a way that it does not on the ordinary citizen." *Id.* at 121. However, my colleagues ignore that the Court's Fourth Amendment balance tilted in favor of the government because, under the circumstances there, the Fourth Amendment "require[d] no more than reasonable suspicion . . .". *Id.* As I shall explain in more detail below, absent individualized suspicion, the majority's attempt to balance interests and determine reasonableness is as unworkable as it is meaningless.

In his concurring opinion, Justice Souter summarized the Court's holding in *Knights* as follows: "We . . . hold that law-enforcement searches of probationers who have been informed of a search condition are permissible upon

41

*individualized suspicion* of criminal behavior committed *during the probationary period*, thus removing any issue of the subjective intention of the investigating officers from the case." *Id*. at 122-3 (Souter, J. concurring) (emphasis added).

Although I disagree with the majority's reading of *Knights*, I agree that the case is central to our inquiry. Unlike *Griffin*, *Knights* was not decided on the basis of a "special need." Rather, the Court used the reasonableness test the majority *purports* to adopt here. The majority does appear to rest its analysis upon *Knights'* traditional reasonableness inquiry. However, I believe that an examination of the competing interests here establishes that my colleagues are actually employing the "special need" doctrine while ignoring the restrictions the Court has so carefully tried to place around it.

### B. Sczubelek's Privacy Interest.

The majority opines that "the intrusion of a blood test is minimal," and concludes that Sczubelek, as an individual on supervised release, does "not enjoy the absolute liberty to which every citizen is entitled." Maj. Op. 19. Under the majority's view, once Sczubelek was convicted of a felony, he could "no longer assert a privacy interest" in his identity, which includes his fingerprints, his photograph, and the "more reliable" means of identification – his DNA. *Id*. at 19-20.[13]

---

[13] The majority relies on various cases from other Circuit Courts of Appeals to support the contention that Sczubelek has a diminished privacy interest in his identity – and more specifically, in his DNA. At least two of these cases are not on point. *See* Maj. Op.20 (relying on *Jones v. Murray*, 962 F.2d 302 (4th Cir. 1992) and *Groceman v. U.S.*, 354 F.3d 411 (5th Cir. 2004). While *Jones* and *Groceman* upheld the

However, while Sczubelek may enjoy lesser Fourth Amendment privacy rights than other citizens, his Fourth Amendment rights are not extinguished. *See United States v. Hill*, 967 F.2d 902, 910 (3d Cir. 1992) ("while a parolee's reasonable expectation of privacy is greater than a prisoner's, it is still less than the average citizen's."). Even prisoners and parolees maintain a reasonable expectation of privacy in their own bodies. *See Tribble v. Gardner*, 860 F.2d 321, 325 (9th Cir. 1988) (stating that digital rectal searches of prisoners must be justified by legitimate penological need).[14]

The majority likens the extraction of Sczubelek's blood to his being fingerprinted and photographed at the time of his arrest. Of course, neither procedure "requires production of

---

constitutionality of the DNA Act, both cases involved prisoners, whose privacy interests are lessened because of concerns of confinement that include the security of the facility in which they are housed. *See Jones*, 962 F.2d at 306 ("We have not been made aware of any case, however, establishing a per se Fourth Amendment requirement of probable cause, or even a lesser degree of individualized suspicion, for the purpose of ascertaining and recording the identity of a person who is lawfully confined to prison."); *Groceman*, 354 F.3d at 413-14 ("Though . . . collection of a DNA sample for purposes of identification implicates the Fourth Amendment, persons incarcerated after conviction retain no constitutional privacy interest against their correct identification . . . The DNA Act, accordingly, does not violate the Fourth Amendment.").

[14]While the majority seeks to minimize the privacy invasion of this procedure, it is important to note that the extraction of blood involves some risk, including infection and transmission of disease. Although this may be viewed as "minimal," the risk present for any given extraction is certainly greater than zero.

evidence below the body surface which is not subject to public view." *In re Mills*, 686 F.2d 135, 139 (3d Cir. 1982). Although Sczubelek may have a lesser expectation of privacy in those physical attributes exposed to public view such as his fingerprints and face, his privacy interests in the information science can extract from his blood is much greater. "Even a limited search of the outer clothing . . . constitutes a severe, though brief, intrusion upon cherished personal security, and it must surely be an annoying, frightening, and perhaps humiliating experience." *Terry v. Ohio*, 392 U.S. 1, 24-25 (1968).

Lastly, the forced extraction of Sczubelek's blood pursuant to the DNA Act "constitutes far more of an intrusion than the mere insertion of a needle into [Sczubelek's] body and the consequent extraction of a blood sample." *United States v. Kincade*, 379 F.3d 813, 867 (9th Cir. 2004) (*en banc* ) ("*Kincade II"*) (Reinhardt, J., dissenting) As Judge Reinhardt so aptly stated in his dissent in *Kincade II*:

> prior cases dealing with the level of intrusion authorized by the taking of blood samples . . . did not confront a regime in which the samples were turned into profiles capable of being searched time and time again throughout the course of an individual's life . . . The startling advance of technology has magnified the power of the initial search authorized by the DNA Act, such that the invasion of privacy is vastly more significant that [sic] we might have previously assumed . . . To reduce searches authorized by the DNA Act to the physical act of taking blood would be to ignore the "totality of the circumstances" surrounding the search and to

44

> ignore the manner in which "the advance of
> technology" has affected "the degree of privacy
> secured to citizens by the Fourth Amendment."
> *Kyllo v. United States*, 533 U.S. 27, 33-34, 121
> S.Ct. 2038, 150 L.Ed.2d 94 (2001).

*Id*.

## C. The Government's Interests.

The majority contends that the government has a
compelling interest in the collection of identifying
information of criminal offenders."  Maj. Op. 20.  The
interests cited by the majority include: (1) increased accuracy
in the investigation and prosecution of criminal cases; (2)
aiding in solving crimes that occur in the future; (3)
exculpating individuals who have been wrongly convicted and
sentenced for a crime and eliminating individuals from
suspect lists when crimes occur; and (4) promoting the two
primary goals of probation – rehabilitation and protecting
society from future criminal violations.  *Id*. at 20-22.

I can no more argue with the legitimacy of such
interests than the Supreme Court could argue with the validity
of the interests of fetal and maternal health in *Ferguson*.
However, here, as there, the government's interest in law
enforcement can not justify this intrusion.

My colleagues are convinced that Sczubelek can have
no legitimate interest in his identity and that the government
has a strong interest in it.  Even *assuming* the validity of that
assessment, the government can not ignore the restraints of
the Fourth Amendment in order to achieve that "interest."
"[T]he gravity of the threat alone cannot be dispositive of
questions concerning what means law enforcement officers

45

may employ to pursue a given purpose." *Ferguson*, 532 U.S. at 86.

The Supreme Court has identified many other groups of people who have a reduced expectation of privacy. *See, e.g., Bd. of Educ. v. Earls*, 536 U.S. 822, 830-31 (students who attend public schools and who participate in extracurricular activities have significantly diminished expectations of privacy); *Wyoming v. Houghton*, 526 U.S. 295, 303 (1999) (drivers and passengers of vehicles have reduced expectations of privacy). One wonders if, under the majority's approach, given a compelling interest for doing so, the government could extract the blood and catalogue the DNA of these individuals as well. The CODIS databank would certainly be far more effective it if contained identifying information from a greater segment of the population than just those who had previously committed certain crimes. Allowing police to catalogue the identity of certain people *before* they commit a crime would deter persons who would otherwise become first offenders. This would make us all safer than an Act that is only aimed at the Sczubeleks of the world.

Moreover, any attempt to justify CODIS as a means of "protecting the innocent" would appear to be more subterfuge than analysis. Although the identifying information on file with the government may occasionally exculpate the falsely accused, that is certainly not a justification for the Act's intrusiveness. As Judge Reinhardt argued in *Kincade II*, "[t]he Act provides no option for DNA testing to those who seek to prove their innocence, and no funding to states or localities to help provide DNA sampling when requested by those who contend that [they] were wrongfully arrested or convicted." 379 F.3d at 869. In addition, anyone who wanted his/her DNA analyzed to provide exculpatory evidence could

46

voluntarily do so without any DNA Act if it was affordable. Not surprisingly, the Act makes no provision for assisting with the costs of such voluntary analysis even though it may exonerate someone who is incorrectly accused of a crime.

The majority also looks to the government's interest in promoting the goals of probation – rehabilitation and protecting society from future criminal violations. My colleagues argue: "[a]s with individuals on probation, individuals on supervised release are associated with higher recidivism rates."  Maj. Op. 22.  However, that argument would justify coerced DNA from others who, like probationers or persons on supervised release, share demographic characteristics that suggest a higher likelihood of criminal behavior than some cohort group.

### D. The Majority's Analysis Is Not Based Upon *Knights*.

The majority states that it is not deciding this case within the "special needs" framework, and that it is instead using the totality of the circumstances test found in *Knights*, 534 U.S. 112.[15]  However, neither of the two pillars of the *Knights* analysis are present here. There, Knights had accepted the terms of the search condition when he was sentenced to probation, and the Court reasoned that he therefore had a "significantly diminished . . . reasonable expectation of privacy." *Id*. at 119-120.   However, Sczubelek did not consent to DNA analysis as the Act was enacted after he was sentenced.  In a footnote, the majority explains "the

---

[15] *See* Maj. Op. at 19, "we believe that it is appropriate to examine the reasonableness of the taking of the sample under the more rigorous *Knights* totality of the circumstances test rather than the *Griffin* special needs exception."

47

fact that the giving of a DNA sample was not originally an express condition of Sczubelek's supervised release is not significant." Maj. Op. 20, n.4..  I cannot agree.  It is relevant to any analysis of his expectation of privacy.

The majority attempts to find support in *Skinner*, Maj. Op. 23, where the Court held that in "limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion." *Skinner*, 489 U.S. at 624.  However, as I have already explained, *Skinner* is a "special needs" case requiring a "special need beyond the normal need for law enforcement.  *Id*. at 621.

*Griffin* was also a special needs case, despite its law enforcement ramifications, because it involved "a search conducted by a probation officer monitoring whether the probationer is complying with probation restrictions." *Knights*, 534 U.S. at 117.  *Knights* explained that *Griffin* "held that a State's operation of its probation system presented a special need for the exercise of supervision to assure that [probation] restrictions are in fact observed." *Id.* at 117 (internal quotation marks omitted).  Despite my colleagues' disclaimer, that is precisely what the majority is arguing here.

The majority's analysis rests upon the same special need as that found in *Griffin* as it substitutes the demands of probation and court supervision for the requirement of individualized suspicion.  In doing so, my colleagues refer to the government's "needs" as "interests." The majority argues: "[a]n additional government interest is promotion of the two primary goals of probation -- rehabilitation and protecting society from future criminal violations."  Maj. Op. at 22

48

(internal quotation marks omitted). The majority notes the higher recidivism rates of probationers, and cites *Griffin* in arguing that persons on supervised release also have a higher incidence of crime. My colleagues reason that the DNA Act therefore furthers a rehabilitative interest/need: "collection of identifying information will indirectly promote the rehabilitation of criminal offenders by deterring them from committing crimes *in the future*." *Id*. at 22 (emphasis added).

However, this is nothing more than arguing that DNA analysis is justified by a special need while ignoring that the "need" relied upon is law enforcement. My colleagues take this approach even though the Supreme Court has "decline[d] to approve a program whose primary purpose is ultimately indistinguishable from the general interest in crime control." *Edmond*, 531 U.S. at 44.

As I have already explained, the special needs exception must be sustained by interests "beyond the normal need for law enforcement. . . ". *Id*.[16] In each of the Court's special needs cases, "the 'special need' that was advanced as a justification for the absence of a warrant or individualized suspicion was one divorced from the State's general interest in law enforcement." *Ferguson*, 532 U.S. at 79. *Knights* can not justify broadening the special needs doctrine to accommodate the DNA Act. If that doctrine is to remain "*closely guarded," Chandler*, 520 U.S. at 309, it is important to properly identify the purpose of the intrusion. *See Edmond*, *supra*. ("If we were to rest the case at this high level of generality, there would be little check on the ability of

---

[16] As I have mentioned above, in *Edmond*, the Court also noted that the intrusion in *Skinner* revealed "the level of alcohol in the employee's bloodstream *and nothing more*." 489 U.S. at 625. DNA, of course, reveals a great deal more.

authorities to construct roadblocks for almost any conceivable law enforcement purpose."). "Law enforcement . . . always serves some broader social purpose or objective . . . virtually any nonconsensual suspicionless search could be immunized under the special needs doctrine by defining the search solely in terms of its ultimate, rather than immediate purpose." *Ferguson*, 532 U.S. at 84.

Furthermore, even assuming *arguendo* that we can ignore the law enforcement objectives here, and apply a *Knights* analysis, the Fourth Amendment balance would still not tip in favor of the government.[17]

### E. The Majority's Reasonableness Inquiry.

The reasonableness inquiry the majority attempts to apply is simply too amorphous and standardless to have any real Fourth Amendment meaning in the absence of individualized suspicion. *See Skinner*, 489 U.S. at 624 ("When the balance of interests precludes insistence on a showing of probable cause, we have usually required 'some quantum of individualized suspicion' before concluding that a search is reasonable.").

When an officer has reasonable suspicion that a

---

[17]Besides *Skinner* and *Knights*, the majority also cites to *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656 (1989), where the Court stated that "[n]either a warrant nor probable cause, nor, indeed any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance." Maj. Op. 15. *Von Raab* is, however, another example of the majority's attempt to rely upon special needs cases while ignoring that doctrine's limitation to "special governmental needs beyond the normal need for law enforcement." *Id*. at 665.

> probationer subject to a search condition is
> engaged in criminal activity, there is enough
> likelihood that criminal conduct is occurring
> that an intrusion on the probationer's
> diminished privacy interests is reasonable.

*Knights*, 534 U.S. at 121.[18]  "The degree of individualized suspicion required . . . is a determination of when there is a sufficiently high probability that criminal conduct is occurring to make the intrusion on the individual's privacy interest reasonable." *Id*. "In determining whether individualized suspicion is required, [we] must consider the nature of the interests threatened and their connection to the particular law enforcement practices at issue." *Edmond*, 531 U.S. at 33.  In order to sustain the DNA search of Sczubelek, we must conclude that it is reasonable to catalogue his DNA even though he has committed no new crimes because of the possibility, however remote or theoretical, that he may one day commit another crime.  We must further conclude that the likelihood of his apprehension is so slight that the identifying information inside his DNA will be necessary to his apprehension even though his fingerprints, photograph, and other personal information is already in law enforcement files, and even though he has heretofore not demonstrated any particular prowess for avoiding arrest and conviction.  The unreasonableness of upholding the DNA Act based upon such a set of assumptions is why it is so important that we not allow such intrusions in the absence of some level of individualized suspicion.

---

[18] The Court did not decide whether the condition so extinguished that expectation that "a search by a law enforcement officer without any individualized suspicion. . . " would have survived constitutional challenge. *Id*. at n.6  That is the question before us.

51

As the Court explained in *Edmond*, "our cases dealing with intrusions that occur pursuant to a general scheme absent individualized suspicion have often required an inquiry into purpose at the programmatic level." *Id*. at 46. That is precisely why a suspicionless search is only valid when it meets a "special need" other than law enforcement. Only in such a special case can the intrusion be deemed "reasonable" given the limitations of the Fourth Amendment. *Id*. at 47 ("While reasonableness under the Fourth Amendment is predominantly an objective inquiry, our special needs and administrative search cases demonstrate that purpose is often relevant when suspicionless intrusions pursuant to a general scheme are at issue."). Individualized suspicion is required for a law enforcement search because "[t]he interests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusions on the mere chance that . . . evidence might be obtained." *Skinner*, 489 U.S. at 644 (Marshall, J. dissenting) (quoting *Schmerber v. California,* 384 U.S. 757, 769-770.(1996). Thus, it is not surprising that "[n]ever once in over two hundred years of history has the Supreme Court approved a suspicionless search designed to produce ordinary evidence of criminal wrongdoing for use by the police." *Kincade II*, 379 F.3d at 853 (Reinhardt, J dissenting.).[19]

My colleagues suggest that the intrusion here is no more invasive than the blood drawing most of us willingly submit to as part of a regular physical examination or diagnostic procedure. *See* Maj. Op. at 19. The two situations are not analogous. Voluntarily submitting to a diagnostic blood test in the office of one's personal physician in order to

---

[19] Judge Reinhardt does note that several Circuit Courts of Appeals have recently done so in upholding the DNA Act. *See Kincade II*, 379 F.3d at 830-832 (citing cases).

evaluate such things as cholesterol levels, blood sugar, or the existence of some disease that the doctor will then treat, does not abrogate a patient's expectation of privacy in the personal information locked up in his/her DNA. Indeed, I think it obvious that most patients would not only be quite surprised, they would be outraged, to discover that their physician turned their blood specimens over to the FBI for inclusion in a searchable DNA database rather than discarding the blood that remained after testing.[20]

However, one need not go this far to appreciate that this intrusion into Sczubelek's retained privacy is unreasonable. Sczubelek has completed every facet of his supervised release except for providing the DNA blood sample, and he is challenging that in court. He has not been rearrested or convicted of any new offenses. Therefore, even assuming that permanently storing a supervised releasee's DNA for the rest of his life will somehow aid the "rehabilitation" process - a dubious proposition offered by my colleagues without supporting authority - the record does not establish that Sczubelek needs any such deterrence. Permanently storing the information inside his DNA will neither help his rehabilitation, nor assist with his supervision.

_____

[20] For reasons not apparent to me, my colleagues suggest that it is relevant that "law enforcement agencies are not involved with the actual search itself. It is only after the testing facility turns over the test kits to the FBI that law enforcement involvement begins." Maj. Op. at 27. I do not understand why that makes a difference, and my colleagues do not explain why it should. The blood is initially drawn for no other purpose than turning it over to law enforcement, and the proxy my colleagues rely on can not so easily circumvent the prohibition against law enforcement involvement in suspicionless searches.

If we are to conclude that the DNA Act is a reasonable intrusion upon the privacy of an entire population of suspicionless individuals, we must assume that the least likely to reoffend needs the same level of "rehabilitation" as the most likely to reoffend; and we must do so even though the "least likely to reoffend will commit no new crimes.[21] This dragnet approach ignores the realities of the recidivism it tries to rely upon. Recidivism rates vary depending largely on the offense of conviction, age at time of first arrest, economic status, and countless other demographics too variable to justify a nondiscriminating search of everyone belonging to the class of persons having criminal records.[22]

_____

[21] Despite the recidivism rates my colleagues allude to, or how the recidivism of prior offenders compares to crime rates in general, it is nevertheless true that very large numbers of offenders covered by the DNA Act will simply not reoffend. Many of them, having paid their "debt to society," will go on to lead productive law abiding lives as contributing members of their communities. "In that case, the special need . .. to maintain the DNA is gone, but the record of the felon's DNA in the CODIS database is not." *Kincade II*, 379 F.3d at 841 (Gould, J., concurring).

[22] *See* generally, Bureau of Justice Statistics, "Criminal Offender Statistics," posted at: http://www.ojp.usdoj.gov/bjs/crimoff.htm#findings (last viewed February 15, 2005). The majority also finds support in the fact that probation officers have no discretion in deciding which individuals are required to give a DNA sample. While it is true that the statute clearly defines the class of individuals it applies to, "[t]he ill that the Fourth Amendment prevents is not merely the arbitrariness of police discretion to single out individuals for attention, but also the unwarranted domination and control of the citizenry through fear of baseless but 'evenhanded' general

Moreover, the risk of recidivism on the first day of supervision is clearly not the same as the risk of recidivism 20 years after someone has successfully completed supervised release, yet if we are to sustain the DNA Act we must believe that the expectation of privacy and the risk of recidivism remain unchanged; the majority's analysis certainly infers as much.

Thus, if we are to accept the majority's emphasis on rehabilitation, then the seizure of Sczubelek's DNA is certainly unreasonable.  He has all but completed his "rehabilitation."   Yet, the scarlet letters of his DNA remain embroidered into the government's database long after he finishes his court supervision and "ages out of" any statistically significant chance of recidivism.

As Judge Reinhardt argues in dissent in *Kincade II*, history teaches that the DNA database will only grow over time to include new categories of citizens who, it can be argued, have a reduced expectation of privacy. *Id.* at 846. ("the most recent list of qualifying offenses, . . . includes a laundry list of federal crimes that is vastly more expansive than the list approved by the 2000 DNA Act."). *Id.* at 846. (Reinhardt, J. dissenting).[23]

---

police searches."  *Rise v. Oregon*, 59 F.3d 1556, 1570 (9th Cir. 1995) (Nelson, J., dissenting).

[23] Judge Kozinski also warns:

[a]nyone who doubts that [the DNA database] will expand, prodded by the voracious appetite of law enforcement, has only to consider the grown of fingerprint databases. . . . Today, the FBI's Integrated Automated Fingerprint Identification System contains the fingerprints of over 47 million people. . . . .

I do not concede that the DNA Act would be a reasonable intrusion under the Fourth Amendment if Congress had restricted the information to the term of an individual's supervision under the criminal justice system. However, the failure to do so only adds to the unreasonableness of the intrusion and further tips the balance toward Sczubelek's side of the Fourth Amendment scale. The Act's do-si-do around the historic requirement of individualized suspicion simply can not be reconciled with the Supreme Court's interpretation of the Fourth Amendment's guarantees.

---

Because the great expansion in fingerprinting came before the modern era of Fourth Amendment jurisprudence ushered in by *Katz v. United States*, it proceeded unchecked by any judicial balancing against the personal right of privacy.

379 F.3d at 873-4. Of course, seizing fingerprints involves no penetration of the skin, seizure of body fluids, nor cataloging of the otherwise personal information stored inside our cells.

I understand that the issue before us is arguably limited to certain identifying information that is stored inside our DNA. However, I think we can, and must, look beyond that in determining if this suspicionless seizure and permanent cataloguing is reasonable because it may well give the government access to a great deal of private information. The Office of Technology Assessment of the United States Congress has warned of the "possibility [of testing] DNA acquired specifically for identification purposes for disease information in a database. . . This option may become more attractive over time, especially as the number and types of probes for genetic disorders increase." Office of Technology Assessment, *Genetic Witness: Forensic Uses of DNA Tests*, July 1990, at 10. (OTA report cited in *Kincaide II*, 379 F.3d at 850-51 (Reinhardt, J., dissenting).

56

### III. Conclusion.

In his dissent in *Skinner*, Justice Marshall cited several instances where courts have been less than vigilant in upholding the liberties in the Constitution and noted that, in each case, the clarity of hindsight brought regret. He cautioned: "[h]istory teaches that grave threats to liberty often come in times of urgency, when constitutional rights seem too extravagant to endure." *Skinner*, 489 U.S. at 635 (Marshall, J., dissenting). More recently, in *Chandler*, the Court quoted approvingly from a dissent Justice Brandeis wrote nearly 75 years earlier in *Olmstead v United States*, 277 U.S. 438 (1928). The *Olmstead* dissent was the prevailing view in *Chandler*, and the Court relied upon it to explain that:

> it is ... immaterial that the intrusion was in aid
> of law enforcement. Experience should teach us
> to be most on our guard to protect liberty when
> the Government's purposes are beneficent.
> [Persons] born to freedom are naturally alert to
> repel invasion of their liberty by evil-minded
> rulers.   The greatest dangers to liberty lurk in
> insidious encroachment by men of zeal, well-
> meaning but without understanding.

*Chandler,* 520 U.S. at 322 (brackets and ellipsis in original) (quoting *Olmstead*, 277 U.S. 479 (Brandeis, J. dissenting)).

Because I believe the DNA Act is such an encroachment, I must respectfully dissent from the decision of my colleagues.

57